# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

BETH PERRY,                        :
                                   :
      Plaintiff         :        No. 3:11-CV-01865
                                   :
   vs.                          :        (Judge Nealon)
                                   :
CAROLYN W. COLVIN, ACTING          :
COMMISSIONER OF SOCIAL             :
SECURITY,                          :
                                   :
     Defendant         :

**MEMORANDUM**

**FILED**
**SCRANTON**

**MAY 2 1 2013**

PER _____
        DEPUTY CLERK

## Background

     The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Beth Perry's claim for social security disability insurance benefits and supplemental security income benefits.

     Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Perry met the insured status requirements of the Social Security Act through September 30, 2008. Tr. 12, 14, 133, 135, 160 and 184.[1]  In order to establish entitlement to

---

1.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of the Answer on December 12, 2011.

disability insurance benefits Perry was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

On March 3, 2010, Perry protectively filed[2] an application for disability insurance benefits and on March 4, 2010, an application for supplemental security income benefits. Tr. 119-120, 128-133, 145-146 and 160. On May 11, 2010, the Bureau of Disability Determination[3] denied Perry's applications. Tr. 12 and 91-98. On May 16, 2010, Perry requested a hearing before an administrative law judge. Tr. 12, 99 and 103-104. After about 11 months had passed, a hearing was held on April 20, 2011. Tr. 52-86. On May 6, 2011, the administrative law judge issued a

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 91 and 95.

decision denying Perry's applications. Tr. 12-25. On June 23, 2011, Perry requested that the Appeals Council review the administrative law judge's decision and on August 15, 2011, the Appeals Council concluded that there was no basis upon which to grant Perry's request for review. Tr. 1-5 and 117-118. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Perry then filed a complaint in this court on October 11, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on May 14, 2012, when Perry elected not to file a reply brief.

Perry was born in or near Athens, Pennsylvania, on April 23, 1984, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 87, 128, 160 and 242.

Perry graduated from high school in 2002 and can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook. Tr. 58, 163, 179

---

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

and 334. During Perry's elementary and secondary schooling she attended regular education classes. Tr. 165. After graduating from high school, Perry attended several colleges and eventually obtained a Bachelor of Arts degree in Management. Tr. 165, 242, 249 and 334.

Perry has past relevant employment[6] as (1) a food service worker which was described as unskilled, medium work by a vocational expert, (2) a cashier for a cigarette store described as unskilled, light work, (3) a stock person for a retail store described as semi-skilled, heavy work, and (4) an envelope stuffer/mail clerk described as unskilled, light work.[7] Tr. 78-79.

6. Past relevant employment in the present case means work performed by Perry during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

7. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most
> (continued...)

4

In March, 2011, Perry told a psychologist that her employment history included work as a factory laborer, cashier, and stocker; and work making subs, as a secretary, in direct sales from her home, and as a babysitter. Tr. 335. She reported that she last worked in April, 2010. Id. However, at least two records report that Perry was working after April, 2010, including one from February, 2011, indicating that she was working at "Smokin Joes", a cigarette store, and as a child care worker/babysitter. Tr. 166 and 272.

Records of the Social Security Administration reveal that Perry had earnings in the years 2000 through 2004 and 2006 through 2010. Tr. 134. Perry's highest annual earnings were in

---

7.  (...continued)
      of the time with some pushing and pulling of arm or leg
      controls. To be considered capable of performing a
      full or wide range of light work, you must have the
      ability to do substantially all of these activities.
      If someone can do light work, we determine that he or
      she can also do sedentary work, unless there are
      additional limiting factors such as loss of fine
      dexterity or inability to sit for long periods of time.

      (c) *Medium work.* Medium work involves lifting no more
      than 50 pounds at a time with frequent lifting or
      carrying of objects weighing up to 25 pounds. If
      someone can do medium work, we determine that he or she
      can do sedentary and light work.

      (d) *Heavy work.* Heavy work involves lifting no more
      than 100 pounds at a time with frequent lifting or
      carrying of objects weighing up to 50 pounds. If
      someone can do heavy work, we determine that he or she
      can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

2007 ($8412.32). Id. One record indicates that Perry's total earnings during 2000 through 2004 and 2006 through 2009 were $21,299.60. Id. In 2009, that same document indicates Perry earned $871.08. Id. However, a second document also indicates that in 2009, Perry had self-employment earnings of $1804.15. Tr. 127. During the 1st and 2nd quarter of 2010, Perry earned a total of $2515.00. Tr. 137. Perry's work and earnings never amounted to substantial gainful activity under the Social Security regulations.[8] The record does not reveal any reported earnings after the 2nd quarter of 2010. Tr. 126, 137, 139-144 and 147-148.

Perry claims that she became disabled on December 8, 2007,[9] because of both physical and mental impairments. Tr. 99, 118, 164. The physical impairments alleged include high blood pressure, obesity, plantar fasciitis, degenerative joint disease

[8]. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity. The official website of the Social Security Administration reveals that in 2000 the amount was $700 per month ($8400 per year); in 2001 the amount was $740 per month ($8880 per year); in 2002 the amount was $780 per month ($9360 per year); in 2003 the amount was $800 per month ($9600 per year); in 2004 the amount was $810 per month ($9720 per year); in 2006 the amount was $860 per month ($10320 per year) in 2007 the amount was $900 per month ($10800 per year); in 2008 the amount was $940 per month ($11280 per year); in 2009 the amount was $980 per month ($11760 per year); and in 2010 the amount was $1000 per month ($12000 per year). Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (Last accessed May 1, 2013).

[9]. Perry was 23 years old on the alleged disability onset date, 26 at the time of the administrative hearing and 27 when the ALJ issued his decision.

of the left knee and headaches. Id. The mental impairments alleged include anxiety, bipolar disorder and attention deficit hyperactivity disorder. Id. Perry claims that her mental impairments and the pain associated with her physical impairments prevent her from working. Id. Perry also claims that fatigue, memory and concentration problems, social phobia, and learning difficulties impact her ability to work. Id.

In a "Function Report - Adult" dated April 7, 2010, submitted during the administrative proceedings, Perry indicated that she lives in an apartment by herself. Tr. 176. Perry stated that she has no problem with her personal care other than noting that "most of the time [she doesn't] care to be clean." Tr. 177. Perry does not need reminders to take care of personal needs and grooming but needs reminders (a chart she created along with a pill holder) to take her medications. Tr. 178. Perry is able to prepare meals daily and engage in housework, including washing the dishes and doing the laundry. Id. She did contend that it takes longer to do the housework because of her impairments and that she needs encouragement. Id. Perry stated that she goes outside 3 to 5 days per week, that she can go out alone and that she is able to drive a vehicle. Tr. 179. Perry is able to shop in stores for groceries and other items every week. Id. Her hobbies include chatting with others via the internet, watching TV, and writing in a journal. Tr. 180. She engages in her hobbies on a daily basis. Id. In the "Function Report," Perry when asked to check items

which her "illnesses, injuries, or conditions affect" did <u>not</u> check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing and using hands. Tr. 181.

At the administrative hearing on April 20, 2011, Perry testified that she has a driver's license and that she is able to drive. Tr. 57. When Perry was asked why she was unable to work, she responded by stating that she cannot focus, concentrate and stay on task; that she has left knee pain and pain in her right foot; that she has osteoarthritis in her left knee; and that her hands get shaky and she is unable to grip things. Tr. 60-63. Perry stated that she had no problem sitting, that she can walk one to two blocks, her physicians have not imposed any lifting restrictions, and that she has no side-effects from her medications. <u>Id.</u> Perry also stated that she was able to take care of a cat and that she performs household chores with difficulty, but that there was no specific household chore that she was not able to perform. Tr. 67.

For the reasons set forth below, the Court will affirm the decision of the Commissioner denying Perry's applications for disability insurance benefits and supplemental security income benefits.

**Standard of Review**

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner.

See <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995). However, the Court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d

9

198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. § 404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in

11

substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

11. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b). An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

12. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of
(continued...)

functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

_____

12. (...continued)
impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

13. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**Medical Records**

Before the Court addresses the administrative law judge's decision and the arguments of counsel, some of Perry's medical records will be reviewed.

At the administrative hearing, Perry was represented by counsel. The ALJ asked counsel if there were any other records which needed to be submitted and counsel stated there were none. Tr. 55.

The earliest medical record encountered is from December 22, 2008, about 3 months after Perry's date last insured. No treating or examining physician, psychiatrist or psychologist has completed a physical or mental functional capacity assessment indicating that Perry had limitations that would prevent her from engaging in any type of work on or prior to her date last insured.

Perry, on December 22, 2008, had an appointment with a podiatrist, Daniel S. Park, D.P.M. Tr. 200. At that appointment Perry complained of "right heel and arch pain x several years" which was "worse with weight bearing." Id. Perry stated that the "[p]ain feels like something is tearing" but indicated that she had some improvement and that a "[h]eel cup [had] helped." Id. A physical examination of Perry revealed that she had plugged sweat

ducts/glands (PSD) on the bottom of her feet.[14] Although the examination revealed tenderness, edema and calor on the plantar aspect of the right heel, Perry's muscle strength, tone, sensation and reflexes were normal. Id. X-rays revealed no plantar heel spur or calcaneal stress fracture. Id. Dr. Park's impression was right plantar fasciitis for which he recommended decreasing Perry's activity and wearing supportive sneakers.[15] When Perry

---

14. There are over 200,000 sweat glands or ducts on the bottom of the feet. Foot Pain Explained, http://www.foot-pain-explained.com/porokeratosis.html (Last accessed May 2, 2013). Seed-like lesions on the bottom of the feet are thought to be clogged sweat glands (porokeratosis). Id.

15. "Plantar fasciitis . . . involves pain and inflammation of a thick band of tissue, called the plantar fascia, that runs across the bottom of [the] foot and connects [the] heel bone to your toes. Plantar fasciitis is one the most common causes of heel pain. Plantar fasciitis commonly causes stabbing pain that usually occurs with [the] very first step in the morning. Once your foot limbers up, the pain of plantar fasciitis normally decreases, but it may return after long periods of standing or after getting up from a seated position." Plantar fasciitis, Definition, Mayo clinic staff, http://www.mayoclinic.com/health/plantar-fasciitis/DS00508 (Last accessed May 5, 2013). Causes of plantar fasciitis are the overstreching or overuse of the plantar fascia, the thick band of tissue. Plantar fasciitis, A.D.A.M. Medical Encyclopedia, PubMed Health, U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth /PMH0004438/ (Last accessed May 5, 2013). It "is commonly thought of as being caused by a heel spur, but research has found that this is not the case. On x-ray, heel spurs are seen in people with and without plantar fasciitis." Id.; see also Plantar Fasciitis and Bone Spurs, OrthoInfo, American Academy of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm? topic=a00149 (Last accessed May 5, 2013). Risk factors for plantar fasciitis include tighter calf muscles that make it difficult to flex the foot and bring the toes up toward the shin, obesity, a very high arch, repetitive impact activity and new or
(continued...)

15

returned for a follow-up appointment with Dr. Park on February 5, 2009, Perry reported some improvement and the physical examination findings were the same. Tr. 201. Dr. Park's impression was the same and he recommended the same type of treatment for the condition and advised Perry to return if she was not improving. Id. There is no indication in the record that Perry had any further appointments with Dr. Park.

On November 30, 2009, Perry underwent a mental health evaluation by Ruth Bresee, a licensed social worker, at Northern Tier Counseling, in South Waverly, Pennsylvania, which resulted in the establishment of a treatment plan. Tr. 246-251. A mental status examination performed by Ms. Bresee of Perry revealed that Perry's mood was anxious with rapid speech and her affect was labile, her hygiene was "good,' her attention was "on task" and her motor activity was "calm." Tr. 247. The anxious mood exhibited by Perry was noted to be associated with Ms. Bresee's evaluation of Perry. Id. Perry's thought processes were intact, she had no delusions, and she self-reported occasionally seeing spots and having difficulty focusing. Id. Perry's immediate memory was impaired only with respect to losing her train of thought. Id. Perry's judgment and insight were "good." Tr. 248. Perry was oriented to person, place, time and purpose. Id. It was

15. (...continued)
increased activity. Id.

16

stated that Perry's intelligence was above average and Perry's impulse control was present. Id.

During this evaluation, Perry reported that she had tried to manage her depression and anxiety over the past 10 to 12 years with the help of "some medication," but was concerned that her mood swings were increasing. Tr. 247. Perry was working "full time" and had been taking Effexor for the past 2 months. Tr. 249. Notably, Perry reported that she "loves to be around people" and Ms. Bresee noted that Perry had "no impairments" and was "mature" with respect to social functioning. Id. Ms. Bresee also noted that Perry's strengths were that she was "very outgoing, likes to manage and can be very 'focused.'" Tr. 251. With respect to Perry's ability to engage in work, Ms. Bresee stated that Perry had "no issues." Tr. 249.

Although there was a Global Assessment of Functioning (GAF) score of 50[16] set forth in the treatment plan, the GAF score

---

16. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60

(continued...)

was not set forth in the evaluation report and appears to conflict with Ms. Bresee's statement that Perry had no issues with respect to her ability to work. Tr. 246. The diagnosis set forth on the one-page treatment plan was mood disorder, not otherwise specified. Id. The treatment plan provided that Perry would undergo "[o]utpatient mental health therapy using [Cognitive-Behavioral Therapy][17] and stress management to train in coping and relaxation skills." Id. The plan also recommended that Perry be evaluated by a psychiatrist. Id. The evaluation report and the treatment plan were signed by Michael Lavin, M.D., a psychiatrist but there is no indication that on that date Dr. Lavin[18] conducted a clinical interview of Perry. Tr. 251 and 246.

On December 9, 2009, Perry was examined by S. Bryan Rouse, M.D., an obstetrician/gynecologist. Tr. 205. Dr. Rouse reviewed Perry's systems and reported as follows: "Negative except

---

16. (...continued)
represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

17. "According to the National Institute of Mental Health . . ., cognitive-behavioral therapy (CBT) is one of the most effective forms of therapy developed to treat anxiety disorders." Anxiety and Stress Management Center, http://www.anxietyandstress management.com/cbt.html (Last accessed May 2, 2013).

18. We are familiar with North Tier Counseling and Dr. Lavin's signature from prior cases.

18

for her menstrual problems."[19] Tr. 206. The report of this appointment notes that Perry was working at "Smokin Joes and child care." Id.

The record contains a form apparently completed by Ms. Bresee dated January 26, 2010, referring Perry for a psychiatric consultation. Tr. 245. The reason for the referral noted was "management of current psychotropic medications" and that "Effexor XR - no longer working." Id. It was further stated on the form that "client continues to have trouble with constantly crying, extreme mood swings, irritability" but her "anxiety [was] improved some with coping skills." Id. The current diagnosis set forth on the form was Diagnostic and Statistical Manual of Mental Disorders Code 296.90, Mood Disorder, not otherwise specified. Id.

On January 28, 2010, Perry had an appointment regarding her psychiatric medications with Sheila Robbins, a nurse practitioner, at Physician Care, P.C., in Wysox, Pennsylvania. Tr. 170 and 199. The record of this appointment does not contain any objective findings other than her weight (330 pounds), height (5'9") and vital signs (blood pressure 136/72, temperature 98.1, pulse 90, respiration 14, and blood oxygen 97%). Tr. 199. The

_____

19. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/ clinicalmed/ros.htm (Last accessed November 6, 2012).

report of this appointment indicates that Perry was taking the drug Effexor. Id. Nurse Robbins reported that Perry suffered from bipolar disorder and adjusted her medication by adding the drug Seroquel. Id. It was also stated that Perry was morbidly obese. Id. Five days later, Perry had a follow-up appointment with Nurse Robbins regarding her psychiatric medications. Tr. 194. At that appointment, Perry stated that the combination of Effexor and Seroquel had improved her status. Id. Nurse Robbins continued Perry's prescription for Seroquel and directed that Perry follow-up with Northern Tier Counseling. Id.

On February 12, 2010, Perry had a medication check at Northern Tier Counseling in North Towanda, Pennsylvania. Tr. 262. Perry was seen by Kim Mansueto, a registered nurse. Id. Perry reported a crying spell and that her mood swings had gotten worse often associated with severe migraines. Id. A mental status examination revealed that Perry was alert and oriented to person, time and place; her appearance was neat; her speech was clear; her mood stable and affect full; and she denied suicidal or homicidal ideations at present. Id. Nurse Mansueto continued Perry on her current medications and advised her to follow-up with her primary care physician regarding the migraines and suggested that she see a neurologist. Id. Nurse Mansueto gave Perry a GAF score of 60, at the top of the range representing moderate symptoms. Id.

On March 2, 2010, Perry had an appointment with nurse Robbins at which Perry requested an increase in her dosage of Seroquel. Tr. 193. The record of this appointment does not contain any objective findings other than her weight (329 pounds), height (5'9") and vital signs (blood pressure 122/94, temperature 98.5, and pulse 88). Tr. 193. Nurse Robbins increased Perry's dosage of Seroquel. Id.

On March 3, 2010, Perry was evaluated at Northern Tier Counseling by Korie D. Lambert, a certified physician's assistant, and Lucille E. Venturanza, M.D., a psychiatrist. After a clinical interview and a mental status examination, it was concluded that Perry suffered from bipolar I disorder, most recent episode mixed and was given a GAF score of 55, representing moderate symptoms. Tr. 241-243. Ms. Lambert and Dr. Venturanza agreed to increase Perry's dosage of Seroquel. Tr. 243.

On March 17, 2010, Perry was seen by a psychiatrist and a physician's assistant for a medication check at Northern Tier Counseling in North Towanda. Tr. 261. A mental status examination revealed that Perry was alert and oriented to person, place and time; she was cooperative; she was tearful at times; her speech was less pressured; her thoughts were goal directed; and she denied suicidal or homicidal ideations. Id. It was noted that Perry had some improvement in mood stability with an increase in

her dosage of Seroquel. Id. Perry was given a GAF score of 55 and prescribed the drug Lamictal. Id.

On March 29, 2010, Perry had an appointment with Paul E. Buckthal, M.D., a neurologist located in Sayre, Pennsylvania, regarding her complaints of headaches. Tr. 207-209. The report of this appointment indicates that Perry was working part-time at Smokin Joes and performing child care. Tr. 208. A physical examination only revealed obesity and mildly reduced reflexes. Tr. 208-209. Dr. Buckthal concluded that Perry suffered from migraine syndrome and metabolic syndrome, but indicated that Perry needed to get control over her anxiety/nerves before effective treatment of her headaches with medications could take place. Tr. 209. The subsequent medical records do not contain any significant complaints of headaches.

An updated treatment plan was prepared by Ms. Bresee at Northern Tier Counseling on March 30, 2010 which indicated that Perry was compliant with her medications, the medications were working and Perry reported positive changes. Tr. 244. The plan further indicated that Perry had no suicidal ideation, occasional crying spells, her mood was stabilizing, and she was learning to manage her emotions. Id. The therapeutic interventions recommended were "[o]utpatient mental health therapy using CBT and stress management to train in coping and relaxation skills through 7/30/10." Id.

22

Perry had a medication check with Denise McClintic, a registered nurse, at Northern Tier Counseling on April 12, 2010. Tr. 260. At that time, Perry's current medications were Seroquel, Effexor and Lamictal. Id. Perry told Ms. McClintic that she had no side effects from the medications, that "[e]verything was going very good" and that "[s]he [was] feeling wonderful compared to before the medications." Id. It was reported that she had ended the relationship with her boyfriend. Id. A mental status examination revealed that Perry was alert and oriented to person, place and time; she denied suicidal and homicidal ideations; she denied auditory and visual hallucinations; her affect was bright and her thought processes were goal directed; and her speech was clear and concise. Id. The assessment was as follows: "Client feels much improvement: happy [with] correct med[ication] regimen [and] continues to work on emotional sadness from breakup." Id.

At an appointment with nurse Robbins at Physician Care, P.C., on April 21, 2010, Perry requested birth control pills. Tr. 192. The current medications listed were Effexor, Seroquel, Lamictal and birth control medication. Id. The record of this appointment indicates that Perry weighed 325 pounds and her blood pressure was 148/98. Id. The assessment by nurse Robbins was that Perry suffered from high blood pressure and obesity. Id. Nurse Robbins noted that Perry was very positive about her ability to lose weight. Id.

23

On April 29, 2010, George Sowerby, M.D., of Northern Tier Counseling, completed a document on behalf of Perry entitled "Pennsylvania Department of Public Welfare Employability Assessment Form." Tr. 216-217. Although there is no indication in the record that Dr. Sowerby examined Perry on April 29 or anytime prior to that date, in the document Dr. Sowerby stated in a conclusory fashion (without detailing her functional limitations) that Perry was temporarily disabled from April 28, 2010 until October 31, 2011, because of bipolar disorder and hypertension. Id.

On May 3, 2010, John N. Grutkowski, Ph.D., reviewed Perry's medical records and concluded that she was not significantly limited in 18 areas of mental functioning and only moderately limited in the following 2 areas: (1) the ability to work in coordination with or proximity to others without being distracted by them and (2) the ability to interact appropriately with the general public. Tr. 223-224. Dr. Grutkowski's assessment was that Perry suffered from a mood disorder but that Perry was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment." Tr. 225.

On May 14, 2010, Perry had an appointment with nurse McClintic at Northern Tier Counseling regarding her medications. Tr. 259. Perry complained that she was having an increase in her

depression and mood swings. Id. A mental status examination revealed that Perry was alert and oriented to time, place and person; her thoughts were organized and her speech was clear and concise; and she denied suicidal and homicidal ideation and auditory and visual hallucinations. Id. Perry's current medications were Seroquel, Effexor and Lamictal and nurse McClintic recommended no change in medication until she could confer with a physician's assistant, Korie Lambert.[20] Id.

On June 4, 2010, Perry had an appointment with nurse McClintic at which she reported that she was having depression "all day long." Tr. 258. A mental status examination revealed that Perry was alert and oriented to person, place and time, and that her thoughts were organized and her mood "ok." Id. Perry's current medications were Seroquel, Effexor and Lamictal. Id. Nurse McClintic continued Perry's current medications.[21] Id.

On June 29, 2010, Perry had an appointment with Ms. Lambert for a medication check at Northern Tier Counseling. Tr. 257. At that appointment Perry complained of increased depression. Id. A mental status examination revealed that Perry

---

20. The report of this May 14, 2010, medication check was signed by Dr. Sowerby on May 19, 2010. There is no indication that Dr. Sowerby conducted a clinical interview of Perry.

21. The report of this June 4, 2010, medication check was signed by Dr. Sowerby on June 30, 2010. There is no indication that Dr. Sowerby conducted a clinical interview of Perry.